**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ABC DISPOSAL SERVICE, INC.,** *et al*. | **Case No: 16-** |
| **Debtors** | **Jointly-Administered**[1] |

## AFFIDAVIT OF MICHAEL A. CAMARA IN SUPPORT OF FIRST DAY MOTIONS

I, Michael A. Camara, hereby declare as follows:

1. I am the Vice President and Chief Executive Officer of ABC Disposal Service, Inc. ("ABC"), the President and Chief Executive Officer of New Bedford Waste Services, LLC ("New Bedford Waste"), and the President of Solid Waste Services, Inc., ("Solid Waste Services"), Shawmut Associates, LLC ("Shawmut Associates"), A&L Enterprises, LLC ("A&L Enterprises") and ZERO Waste Solutions, LLC ("ZERO Waste").[2] In these capacities, I am familiar with the Debtors' day-to-day operations, business and financial matters.

2. I make this affidavit in support of the Debtors' *Motion for Entry of Order (1) Authorizing the Use of Cash Collateral, (2) Granting Replacement Liens, (3) Scheduling a Hearing on the Further Use of Cash Collateral, and (4) Granting Other Relief* (the "Cash Collateral Motion") and the *Motion to (A) Pay Prepetition Wages, Salaries, and Benefits and Honor Certain Accrued Prepetition Obligations pursuant to 11 U.S.C. §§105(a), 363(b),*

---

[1] The other debtors in these jointly-administered cases are: New Bedford Waste Services, LLC, Solid Waste Services, Inc., Shawmut Associates, LLC, A&L Enterprises, LLC, and ZERO Waste Solutions, LLC.

[2] ABC, Solid Waste, New Bedford Waste, Shawmut, A&L Enterprises, and ZERO Waste are collectively referred to as the "Debtors."

*507(a)(4), and 507(a)(5); and (B) Use Existing Payroll Accounts and Business Forms* (the "Wage Motion" and with the Cash Collateral Motion, the "First Day Motions").

3. Except as otherwise indicated, all statements in this affidavit are based upon (a) my personal knowledge as an officer, director, or member of the Debtors, (b) my review of relevant documents, including the Debtors' books and records; (c) information supplied to me by other members of the Debtors' management and employees, or other professionals retained by the Debtors; and (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs.

4. As an officer, director, and/or a member of the board of managers of the Debtors, I participated in the decision to cause the Debtors to file a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et. seq*. (the "Bankruptcy Code") on May 11, 2016 (the "Petition Date").

5. I have reviewed the Debtor's voluntary petitions and the First Day Motions. The First Day Motions seek to ensure, among other things, the continuation of the Debtors' business operations without interruption, and maintain the support and confidence of the Debtors' employees, suppliers, and customers, all of which will be critical to the Debtors' reorganization efforts.

**BACKGROUND**

6. The Camara family has successfully operated a waste disposal and processing business in Southeastern Massachusetts since 1967 when my parents Arnold and Laurinda Camara purchased a small waste hauling operation with only two trucks. The Debtors have grown their business exponentially over the last 49 years and enjoy a large market share providing waste disposal and processing services across Southeastern Massachusetts, Cape Cod,

2

and Rhode Island.  The Debtors currently employ more than 200 people filling a critical need for the municipalities and other customers that they service.  The Debtors have numerous longstanding relationships with the people and businesses in the communities in which they serve.

**A.     The Debtors' Businesses.**

7.      The Debtors are all Massachusetts corporations or limited liability companies with a principal place of business of 1245 Shawmut Avenue, New Bedford, Massachusetts.

8.      ABC was organized in April 1981 and employs approximately 174 people.  ABC provides full service waste hauling, disposal and recycling services, and sells, rents and services compaction and baling equipment to a variety of industrial, institutional, commercial and construction related customers.  ABC has long term contracts with six (6) municipalities including, but not limited to, New Bedford, Fairhaven, Mattapoisett, Plymouth, Rochester, and Seekonk, Massachusetts. ABC also provides disposal services directly to residents of other municipalities on an individual basis and not through a contract with the municipality.  The majority of waste hauling services are typically performed on a scheduled weekly basis.  Other rental, hauling, and disposal services are provided on an as-needed basis upon request by customers.

9.      New Bedford Waste is a Massachusetts limited liability company organized in February 1999 with approximately 27 employees.   New Bedford Waste owns and operates municipal solid waste and construction and demolition debris transfer stations in New Bedford, Sandwich, and Rochester, Massachusetts which transfer and process residential, commercial, industrial, and institutional and construction wastes under approved state and local government permits and licenses.  It also provides paper recycling and construction and demolition debris

recycling in a state-of-the-art facility in New Bedford. Approximately one-third (33%) of the waste processed at that facility is collected and delivered by ABC. The remainder is waste from unaffiliated third-party disposal companies.

10. Solid Waste Services, Inc. is a Massachusetts corporation organized in 1999 to hold an ownership interest in New Bedford Waste.

11. Shawmut Associates and A&L Enterprises are Massachusetts limited liability companies which own and lease real estate to ABC and New Bedford Waste in connection with their operations. Shawmut Associates was organized in 2000 and owns four properties in New Bedford Massachusetts, one property in Sandwich, Massachusetts, and one property in Rochester, Massachusetts. A&L Enterprises was organized in 2001 and owns a property in New Bedford, Massachusetts.

12. ZERO Waste is a Massachusetts limited liability company formed in 2013 for the purposes of developing and operating an advanced mixed waste recycling facility located on Shawmut Associates' Rochester property to process and market recyclable material and then turn unrecyclable material into compact, clean burning, high yield fuel briquettes which have a variety of industrial uses. The facility is not completed and Zero Waste is not operating.

13. The principals of the Debtors are Laurinda F. Camara and her children Susan M. Sebastiao, Kenneth J. Camara, Steven A. Camara, and myself (the "Principals"). Each of the Principals owns twenty percent (20%) of the stock in ABC. Each of Susan M. Sebastiao, Kenneth J. Camara, Steven A. Camara and myself own a twelve and one-half percent (12.5%) interest in New Bedford Waste and a twenty five percent (25%) interest in Shawmut Associates, A&L Enterprises, and Solid Waste Services. Solid Waste Services owns the remaining fifty

Case 16-11787    Doc 12    Filed 05/11/16    Entered 05/11/16 14:45:42    Desc Main
              Document      Page 5 of 19

percent (50%) of the membership interests in New Bedford Waste.  New Bedford Waste owns eighty-percent (80%) of the membership interests in ZERO Waste.[3]

**B.     The Debtors' Operations.**

14.     The Debtors' operations and gross revenues have grown significantly in the several years preceding the Petition Date with expansions of both of ABC's and New Bedford Waste's operations following, among other things, the purchase of additional properties including transfer stations in Rochester and Sandwich.  These expansions allowed the Debtors to service more customers.  ABC has entered into long term contracts with its municipal customers in 2013 and 2014 while simultaneously expanding its as-needed "roll-off" construction and industrial disposal operations.  In connection with the increase in its customer base, ABC expanded its fleet of vehicles and workforce, resulting in increased operational costs.

15.     Payment terms for the Debtors' services vary, but a majority of their customers, including the municipalities they serve are invoiced monthly with payment due within thirty (30) days of such invoice.  Other individual residential customers are invoiced quarterly, in advance.  Invoices for "roll off" disposal services are typically issued at the time such service is rendered with payment due within thirty (30) days.

16.     The Debtors' expansion resulted in a corresponding increase in annual gross revenue, which has grown to approximately $50 million annually.  Seasonality affects the Debtors' operations as revenue increases in the spring and summer months.

17.     Transportation, labor, and disposal expenses constitute the Debtors' principal operating costs.  Until the ZERO Waste facility is opened, the Debtors must accept, transport and

---

[3] The remaining twenty percent (20%) of ZERO Waste is owned by WERC-2, Inc., which is a Massachusetts corporation in which New Bedford Waste also holds an equity interest.

dispose a large portion of municipal solid waste and other materials in third-party area landfills as well as disposal sites in Rhode Island, New Hampshire, New York, and Canada. The contract rates paid by the Debtors for disposal fluctuate depending upon availability and demand.

**C.    The Debtors' Financing Arrangements.**

18.    In or around May 2009, the Debtors entered into a loan agreement with Comerica Bank ("Comerica") to finance their operations, which loan was secured by liens on some but not all of the Debtors' assets.

19.    In 2013 the Debtors began discussions with Webster Bank, National Association ("Webster") regarding providing funding of approximately $50,000,000 to refinance the Comerica facility, to provide working capital, to purchase additional equipment, and to construct the ZERO Waste facility. At the time, Shawmut Associates was party to several loan agreements with Webster secured by individual mortgages on certain of the Shawmut properties.

20.    Those discussions continued for approximately seven (7) months with Webster expressing interest in providing the requested financing. Ultimately, as set forth below, only a portion of the funding was provided. As a consequence, the Debtors have been unable to complete the ZERO Waste facility.[4]

21.    In late 2013, certain of the Debtor entities entered into a commitment letter with Webster with respect to a credit facility in the approximate principal amount of $29,000,000 intended to refinance the Debtors' obligations to Comerica and provide additional working capital. On or about December 18, 2013, ABC entered into an agreement with Webster for a bridge loan in the principal amount of $3,000,000 (the "Bridge Loan").

---

[4] The Debtors believe that they have claims against Webster and reserve their rights with respect to those claims.

6

22. On February 12, 2014, ABC, New Bedford Waste, and A&L Enterprises (collectively, the "2014 Borrowers") entered into a Loan Agreement with Webster[5] to borrow up to $26.2 million (the "2014 Loan") to payoff both the Bridge Loan and the Comerica obligations and to provide working capital to ABC and New Bedford Waste. In connection therewith, ABC executed the following promissory notes:

    a. Promissory Note (Revolving Loan) dated February 12, 2014 in the original principal amount of $250,000;

    b. Promissory Note (Term Loan) dated February 12, 2014 in the original principal amount of $8,800,000; and

    c. Promissory Note (Staged Advance Term Loan) dated February 12, 2014 in the original principal amount of $12,600,000.

New Bedford Waste executed the following promissory notes:

    a. Promissory Note (Revolving Loan) dated February 12, 2014 in the original principal amount of $300,000;

    b. Promissory Note (Term Loan) dated February 12, 2014 in the original principal amount of $3,400,000; and

    c. Promissory Note (Staged Advance Term Loan) dated February 12, 2014 in the original principal amount of $850,000.

The revolving loans matured and have been satisfied. The ABC staged advance loans have ten (10) year terms. The remaining terms loans have seven (7) year terms.

23. Pursuant to the 2014 Loan, Webster has issued the following outstanding letters of credit (collectively, the "Letters of Credit"):

    a. Standby letter of credit 10767 in the amount of $1,968,702.07 in favor of U.S. Bank as Trust Indenture on account of a certain bond from MassDevelopment related to the New Bedford Waste processing facility;

---

[5] Citizens Bank, N.A. ("Citizens") is a lender-participant under the 2014 Loan. Webster acts as agent for both lenders pursuant to the terms of the applicable loan documents.

   b. Standby letter of credit 10517 in the amount of $37,500 for the benefit of the Massachusetts Department of Environmental Protection (the "DEP");

   c. Standby letter of credit 10623 in the amount of $80,905 for the benefit of the DEP;

   d. Standby letter of credit 10624 in the amount of $125,607 for the benefit of the DEP; and

   e. Standby letter of credit 10625 in the amount of $55,435 for the benefit of the DEP.

24. The 2014 Loan is guaranteed by ABC, New Bedford Waste, Solid Waste Services, A&L Enterprises, and certain of the Principals.

25. Based upon the financing provided under the 2014 Loan and the expectation that the remainder of the financing requested from Webster would be funded, the Debtors acquired additional rolling stock, aggressively contracted with new customers, and undertook construction and development of the ZERO Waste facility. Consistent with the forgoing, ABC entered into a series of agreements with General Electric Capital Corporation ("GE Capital") to enlarge and modernize its truck fleet (collectively, the "Vehicle Loans").[6]

26. In late 2014 it became apparent that the lack of financing from Webster compromised the Debtors' cash flow, placing a burden on their operations and financial position. As a result, shortly after the closing of the 2014 borrowing, the 2014 Loan allegedly went into default and the Debtors were shut off from their lines of working capital credit. As a consequence, the Debtors were forced to obtain additional working capital from a non-traditional lender, Small Business Term Loans, Inc. or BFS Capital d/b/a BFS Financial Services (collectively, "BFS"). The BFS transactions (the "BFS Loans") required weekly and eventually daily payments.

---

[6] BMO Harris Bank, N.A. ("BMO") subsequently acquired the Vehicle Loans from GE Capital.

27. When it became apparent that Webster did not intend to fund ZERO Waste, the Debtors made an extensive effort to obtain funding from alternative sources. While there was substantial interest expressed by several lenders and capital providers, the Debtors were not able to secure additional funding. Contemporaneously, the seasonal increase in demand put further strain on the Debtors' working capital and the Debtors became unable to make their periodic debt payments. As described below, several of the Debtors' creditors initiated actions against the Debtors or otherwise took steps to exercise control over the Debtors' assets. When Webster terminated its forbearance negotiations with the Debtors, the Debtors were forced to file these cases to preserve their assets.

**D.     The Debtors' Assets.**

ABC DISPOSAL SERVICE, INC.

28. ABC's tangible assets include, without limitation, (a) approximately 230 titled vehicles including tractors, loaders, and semi-trailers, (b) various pieces of equipment such as welders, compressors, and plasmas cutters, and containers (the "ABC Equipment"), (c) an inventory of parts used to maintain its titled vehicles and equipment, (d) various materials used in either in the disposal business or for maintenance, and (e) used office furniture and equipment. The Debtors' vehicles and equipment were subject to an appraisal in October 2014. That appraisal assigned ABC's titled vehicle fleet an orderly liquidation value of approximately $11.7 million and certain of the ABC Equipment an orderly liquidation value of approximately $3.9 million.

29. Approximately 180 of the vehicles in ABC's titled vehicle fleet appear to be unencumbered by any liens. Although Webster may claim those vehicles as its collateral, no liens are noted on the certificates of title in ABC's possession.

30.     ABC's intangible assets consist of its permits, contracts, and accounts receivable. As of May 2, 2016, ABC's accounts receivable totaled approximately $1,581,273, approximately forty-four percent (44%) of which was aged more than sixty (60) days.

NEW BEDFORD WASTE SERVICES, LLC

31.     New Bedford Waste's tangible assets include the transfer station in New Bedford, certain equipment (the "NBWS Equipment") and materials used at the processing plant in New Bedford, and used office furniture and equipment. The 2014 appraisal of the Debtors' equipment assigned certain of the NBWS Equipment an orderly liquidation value of approximately $2.6 million as of October 14, 2014.

32.     New Bedford Waste's intangible assets include its permits, contracts, and accounts receivable. As of May 2, 2016, New Bedford Waste's accounts receivable totaled approximately $1,037,688, approximately thirty-three percent (33%) of which was aged more than sixty (60) days.

SOLID WASTE SERVICES, INC.

33.     Solid Waste Services owns fifty percent (50%) of the interest in New Bedford Waste.

SHAWMUT ASSOCIATES, LLC

34.     Shawmut Associates owns multiple parcels of property across Southeastern Massachusetts. Among others, it owns a 2.4 acre parcel in New Bedford located at 1228 Shawmut Avenue which is improved by offices and other commercial space used principally for ABC's operations and adjacent or abutting properties located at 1069, 1136, and 1200 Shawmut Avenue and 994-998 Nash Road which total approximately seven (7) acres. It also owns the 31 acre parcel in Sandwich, Massachusetts located at 295 Service Road which is improved by the

New Bedford Waste transfer station (the "Sandwich Property"), and the 69 acre property in Rochester, Massachusetts located at 48-50 Cranberry Highway improved by another New Bedford Waste transfer station and the planned location for the ZERO Waste processing facility (the "Rochester Property").

### A&L ENTERPRISES, LLC

35. A&L Enterprises owns three parcels of land in New Bedford, Massachusetts totaling approximately twenty-six (26) acres located at 1245 Shawmut Avenue which are improved by the New Bedford Waste processing facility.

### ZERO WASTE SERVICES, LLC

36. ZERO Waste owns certain materials and equipment that were purchased in connection with the construction of the ZERO Waste facility. Their value is undetermined and ZERO Waste has no cash or receivables.

**D.    The Debtors' Liabilities.**

### WEBSTER BANK, NATIONAL ASSOCIATION

37. In connection with the 2014 Loan, Webster asserts to be owed approximately $20.1 million from the 2014 Borrowers as follows:

   a. Approximately $2.5 million on account of New Bedford Waste's obligations under its 2014 term loan;

   b. Approximately $6.4 million on account of ABC's term loan obligations; and

   c. Approximately $11.2 million on account of ABC's staged advance term loan obligations.

The 2014 Borrowers have contingent obligations to reimburse Webster for any payments made under the Letters of Credit in an amount up to $2,268,149.

11

38. Webster asserts liens upon all or substantially all of the assets of ABC, New Bedford Waste, and A&L Enterprises, and a lien on the membership interests of Solid Waste Services in New Bedford Waste pursuant to UCC-1 financing statements filed with the Secretary of the Commonwealth. Webster asserts to hold a mortgage on 1245 Shawmut Avenue. As noted above, there are no Webster liens noted on the certificates of title of ABC's titled vehicles.

39. In connection with its loans to Shawmut Associates, Webster asserts that Shawmut Associates owes it approximately $6 million as follows:

   a. Approximately $4.7 million on account of a loan to Shawmut secured by mortgages dated December 16, 2011 on 1136 Shawmut Avenue, the Nash Road Property, the Rochester Property, and the Sandwich Property;

   b. Approximately $354,000 on account of a loan to Shawmut secured by a mortgage dated December 10, 2009 on 1069 Shawmut Avenue;

   c. Approximately $301,000 on account of a loan to Shawmut secured by a mortgage dated June 29, 2009 on 1136 Shawmut Avenue and the Nash Road Property;

   d. Approximately $138,000 on account of a loan to Shawmut secured by a mortgage dated July 22, 2011 on 1228 Shawmut Avenue; and

   e. Approximately $520,000 on account of a loan to Shawmut secured by a mortgage dated April 5, 2013 on 1200 Shawmut Avenue.

40. Webster asserts to hold a mortgage dated February 13, 2012 on 1136 Shawmut Avenue and the Nash Road Property to secure asserted indebtedness under certain letter of credit and guaranty obligations of Shawmut Associates in the asserted principal amount of $261,947.

41. Webster may assert to have an interest in or a lien on rents or other proceeds generated from the Debtors' properties.

BMO HARRIS BANK, N.A.

42. BMO asserts to be owed approximately $3.7 million on account of the Vehicle Loans, and asserts a security interest in approximately eight (8) of ABC's titled vehicles.

12

43.  As a result of certain asserted prepetition defaults, BMO initiated an action in against ABC, New Bedford Waste and certain of the Principals in Bristol County Superior Court captioned as *BMO Harris Bank v. ABC Disposal Service, Inc., et al*, Civ. A. No. 1673-CV-0379. ABC, and New Bedford Waste as a guarantor under the Vehicle Loans, have entered into a forbearance agreement with BMO which provided for certain periodic payments to BMO and certain remedial actions.  In exchange BMO agreed to forbear from exercising its rights under the Vehicle Loans and to stay the state court action.

BOSTON FINANCIAL SERVICES, ET AL.

44.  BFS has commenced suit against ABC, New Bedford Waste and certain of the Principals in a United States District Court proceeding captioned as *Small Business Term Loans, Inc. d/b/a BFS Capital v. ABC Disposal Service, Inc., et al.*, Civ. A. No. 16-10454 asserting breach of contract and guaranty claims in connection with the BFS Loans (the "BFS Suit").  BFS asserts liens upon all or substantially all the assets of ABC, New Bedford Waste, and Solid Waste Services.  BFS asserts to be owed approximately $1.6 million under the BFS Loans.[7]  Each of the defendants has filed an answer in the BFS Suit.  ABC and New Bedford Waste deny any liability to BFS and have moved to add counterclaims against BFS and its predecessor for, among other things, violation of the Massachusetts usury statute, unjust enrichment, unfair and deceptive trade practices pursuant to M.G.L. ch. 93A, and civil conspiracy.

---

[7] BFS has also filed a UCC-1 Financing Statement against ZERO Waste relating to a cross-guaranty executed by ZERO Waste in connection with one of the BFS Loans.  According to the BFS Loan documents, ZERO Waste granted only a security interest in its business checking account to BFS.  The BFS Suit does not name ZERO Waste as a defendant.

OTHER ASSERTED SECURED CLAIMS

45. Various contractors have recorded notices of contract, statements of account, and/or complaints on the title of the Rochester Property alleging to be owed certain amounts and alleging mechanics liens pursuant to M.G.L. ch. 254 in connection with the construction of the ZERO Waste facility as follows:

    a. Barnes Buildings & Management Group, Inc. and Page Building Construction Co., Inc. in the amount of $117,504;

    b. ThyssenKrupp Elevator Corp. in the amount of $32,747;

    c. Rykor Concrete & Civil, Inc. and Page Building Construction Company in the amount of $65,992;

    d. Page Building Construction Company and Shawmut Metal Products, Inc. in the amount of $160,230;

    e. Breen & Sullivan Mechanical Services, Inc. and Page Building Construction Company in the amount of $2,897,272; and

    f. Aluminum & Glass Concepts, Inc. in the amount of $57,840.

46. Other than a limited grant of security to BFS in its checking account, I am not aware of any consensual liens granted by ZERO Waste.

47. Various other parties assert liens or other security interests in certain delineated personal property of the Debtors based upon leases or sales of such property to the Debtor.

UNSECURED LIABILITIES

48. In connection with the construction of its construction debris and recycling facility in New Bedford, New Bedford Waste is obligated for variable rate demand revenue bonds issued by the Massachusetts Development Finance Agency, which mature in 2021. New Bedford Waste is obligated to make monthly payments equal to one-twelfth (1/12) of the scheduled annual principal and interest repayment amount to a third-party sinking fund

administrator, U.S. Bank, as trustee. New Bedford Waste's obligations are secured by the Letter of Credit issued by Webster and identified above in the amount of $1,968,702.07.

49. As of the date of this affidavit, the Debtors owe their employees approximately $280,000, representing approximately seven (7) days' payroll in arrears.

50. ABC estimates its outstanding unsecured payables, excluding any inter-company debts, total approximately $2.5 million, approximately $1.2 million of which is aged over ninety (90) days.

51. New Bedford Waste estimates that its outstanding unsecured payables, excluding inter-company debts, total approximately $2.5 million with $1.15 million aged over ninety (90) days.

## CHAPTER 11 PROCEEDINGS

52. The purpose of the Debtors' Chapter 11 proceedings is to effectuate a restructuring of their obligations and/or a recapitalization of their businesses or a refinancing of their current obligations. In furtherance of their reorganization efforts, the Debtors seek the following relief:

**A.    Motion to Use Cash Collateral**

53. ABC and New Bedford Waste have filed the Cash Collateral Motion seeking authority to use funds in which Webster and BFS (collectively, the "Lienholders") may have an interest in accordance with the budget attached thereto. ABC and New Bedford Waste require the use of cash collateral to pay the necessary expenses to operate their businesses including but not limited to payments to landfills and transportation costs which are essential to their waste hauling and disposal businesses, to fund payroll of their 200 employees and to pay the necessary and associated taxes related to their operations. The proposed use of cash collateral includes

payment of all expenses necessary to maintain their properties including payment of required real estate taxes and insurance. As is demonstrated by the Cash Collateral Motion, the Debtors have sufficient cash collateral to fund their operations and maintain their assets during the period of proposed cash collateral use.

54. In order to provide the Lienholders with adequate protection on account of the use of the cash collateral, the Debtors propose to grant the Lienholders replacement liens (the "Replacement Liens") on the same types of post-petition property of the estates against which the Lienholders held liens as of the Petition Date. The Replacement Liens shall maintain the same priority, validity and enforceability as the Lienholders' pre-petition liens. The Replacement Liens shall be recognized only to the extent of the diminution in value of the Lienholders' prepetition collateral after the Petition Date resulting from the Debtors' use of the cash collateral during the bankruptcy case.

55. The use of cash collateral will enable the Debtors to pay the obligations necessary to maintain their operations during their reorganization efforts, preserve at least 200 jobs in the Commonwealth of Massachusetts, and preserve the value of their assets. Absent the use of the cash collateral, the Debtors would be required to cease operations, resulting in, among other things, the forced liquidation of their assets at a reduced return to the estates, the material diminution in the value of their accounts receivable, and the termination of the Debtors' employees – all to the detriment of the Debtors, the Debtors' estates, and all creditors and interest holders. The approval of the use of the cash collateral on the terms set forth in the Cash Collateral Motion is, therefore, in the best interests of the Debtors, their bankruptcy estates and their creditors.

56. The value of the Lienholders' secured position will be adequately protected during the Debtors' use of cash collateral by way of the Replacement Liens, the Debtors' maintenance of their real property interests, and the payment of all associated real estate, taxes, insurance, and maintenance costs.

**B.      Motion to Pay Prepetition Wages and Benefits.**

57. The Debtors have filed the Wage Motion seeking authority to pay or have honored their employees' prepetition wages, reimbursable expenses, associated taxes, and vacation and sick pay obligations in the ordinary course of their business.  Under standard payroll procedures, the Debtors' payrolls are processed weekly in arrears – on the last business day of the week following the relevant weekly pay period.  The Debtors have not funded or paid employees for the period of May 1, 2016 through the Petition Date.  The total amount of the Debtors' prepetition wage obligations is approximately $280,078.  The Debtors customarily reimburse employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtors, including, among others, those incurred in connection with travel, long-distance telephone charges, and cellular phone charges.  The Debtors provide between 40 and 160 hours of paid vacation for employees per year.  The Debtors also provide up to five (5) days' sick pay for employees per year.  No employee will receive more than $12,850 on account of payment of the Prepetition Wage Obligations, continued compliance with the Debtors' vacation and sick leave policies. Accordingly, the proposed relief will not exceed the priority ceilings set forth in 11 U.S.C. § 507(a)(4).

58. The Wage Motion also seeks authority to pay the reported prepetition claims under their health care plan (the "<u>Health Plan</u>") and their workers' compensation insurance in the ordinary course.  The Debtors' offer a self-insured Health Plan that is administered by Health

17

Plans, Inc. In connection with the Health Plan, the Debtors pay certain monthly premiums. The Debtors also pay the direct employee health claims, less any deductibles or co-pays paid by employees. The Debtors receive invoices for claims made approximately two (2) weeks following the submission of a claim by an employee, which invoices are due approximately seven (7) days later. The Debtors estimate that the average total weekly cost of the Health Plan is approximately $23,500. As of the Petition Date, the Debtors estimate that they owe approximately $85,000 on account of claims through the Petition Date under the Health Plan. The proposed payments will not exceed the statutory ceilings set forth in 11 U.S.C. § 507(a)(5).

59.     Finally, the Debtors request authority to use existing payroll accounts and business forms for a limited period of time to allow the payments requested to be made to be honored in the ordinary course of business.

60.     It is crucial that the Debtors be permitted to pay their prepetition wage obligations, to fund their benefit programs, and to honor prepetition vacation and sick pay in the ordinary course of business. Approval of such payments will assist in maintaining the continuity of the Debtors' businesses during the administration of these estates. A potential loss (or delay in receipt) of earned wages or salaries would work a hardship on the employees and may damage employee morale. Use existing prepetition payroll accounts under this motion will conserve resources and relieve administrative burden.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Attested to this _11th_ day of May, 2016.

                                                                                    _/s/ Michael Camara, CEO_
                                                                    Michael A. Camara, Chief Executive Officer